UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. _____

_____

STEPHEN ARPAIA, Individually and on Behalf of
All Others Similarly Situated,

        Plaintiffs,

        v.

NISSAN NORTH AMERICA, INC.

        Defendant.

_____/

CONSUMER CLASS ACTION COMPLAINT

Plaintiff, STEPHEN ARPAIA, individually and on behalf of all others similarly situated, and by and through the undersigned counsel, hereby set forth their claims against Defendant NISSAN NORTH AMERICA, INC. in this Consumer Class Action Complaint.

## NATURE OF THE CASE

1.    Plaintiff brings claims under the consumer protection laws of California against Defendant NISSAN NORTH AMERICA, INC. ("NISSAN").

2.    This action arises from the sale or lease of more than one hundred thousand vehicles throughout Florida and the United States manufactured by Defendant NISSAN equipped with defective transmissions called the "Xtronic CVT (Continuously Variable Transmission)." These defective transmissions were installed in all model year 2011 - 2015 Nissan Rogues (the "AFFECTED VEHICLES") sold or leased to consumers, including Plaintiff.

1

At the time each AFFECTED VEHICLE was sold or leased, each AFFECTED VEHICLE was equipped with a dangerous and irreparably defective transmission known as the Xtronic Continuously Variable Transmission ("Xtronic CVT").

3.     This Xtronic CVT is defective in design, and as a result is prone to overheating during normal driving conditions which causes a failure to accelerate and deceleration despite the driver's input with the accelerator pedal (the "Defect"). This Defect creates unreasonably dangerous situation, one which Defendant has admitted increases the risk of a crash. It is inevitable that an individual will be injured or killed due to a collision caused by this safety defect, if it has not already happened.

4.     NISSAN sold and leased the AFFECTED VEHICLES despite its awareness of the Defect and the extreme danger it poses to consumers and other drivers.

5.     NISSAN chose financial gain at the expense of consumer safety by concealing and omitting a disclosure of this critical safety Defect to consumers prior to those consumer purchases or leases of AFFECTED VEHICLES.

6.     NISSAN has been aware of the safety hazard posed by the defective Xtronic CVT transmissions before the first AFFECTED VEHICLE was ever sold. NISSAN should not have sold, leased, or marketed the AFFECTED VEHICLES without a full and complete disclosure of the AFFECTED VEHICLES' safety defect, and should have voluntarily recalled the AFFECTED VEHICLES long ago. NISSAN was under a duty to disclose the Defect.

7.     Plaintiff brings this action on behalf of himself and all those similarly situated ("CLASS," "CLASS Members," "Consumers," "Owners") for NISSAN's deceptive trade

2

practices in violation of the consumer protection laws of Florida and California, unjust

enrichment, and for equitable relief. Plaintiffs seek damages, injunctive and declaratory relief,

restitution, disgorgement of profits, attorney's fees and costs, punitive damages, and any other

relief that Court deems proper.

## JURISDICTION AND VENUE

8.      The United States District Court for the Southern District of Florida has subject

matter jurisdiction over this action under the Class Action Fairness Act because there is minimal

diversity and the matter in controversy exceeds the sum or value of $5,000,000.00 exclusive of

interests and costs. 28 U.S.C. § 1332(d)(2)(A). None of the causes of action stated here has been

assigned or otherwise given to any other court or tribunal.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) - (c). NISSAN

does substantial business in the State of Florida and within this Judicial District, is registered to

and is doing business within the State of Florida, and otherwise maintains requisite minimum

contacts with the State of Florida. Additionally, NISSAN distributes AFFECTED VEHICLES in

this District and receives substantial compensation and profits from the sale and lease of

AFFECTED VEHICLES in this District, and has and continues to conceal and make material

omissions in this District so as to subject it to in personam jurisdiction in this District.

10.     Furthermore, venue is proper in this District because, like many other Florida

consumers who purchased or leased AFFECTED VEHICLES, significant and material aspects of

the transactions relating to Plaintiff Arpaia's purchase of his AFFECTED VEHICLE occurred

within and were otherwise connected to this Judicial District.

3

**"AFFECTED VEHICLES"**

11.     Defendant NISSAN NORTH AMERICA, INC. is the developer, designer, manufacturer, assembler, tester, inspector, marketer, advertiser, distributor, seller, and warrantor of model years 2011 - 2015 Nissan Rogues equipped with the defective Xtronic CVT transmission ("AFFECTED VEHICLES"). In promoting, selling, and warranting AFFECTED VEHICLES, NISSAN acts through numerous authorized dealers, representatives, agents, and advertising and social media platforms.

**PARTIES**

12.     Plaintiff Stephen Arpaia, a proposed CLASS representative, is an adult resident of Florida residing in Palm Beach County.

13.     Defendant NISSAN NORTH AMERICA, INC. ("NISSAN") is a foreign California corporation. NISSAN operates, maintains offices, imports vehicles and parts, and conducts business in California and Florida.

14.     Pursuant to Rules 23(b)(2), and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff will seek certification of a Nationwide Consumer CLASS consisting of:

> **All consumer residents in the United States who own, owned, lease, or leased a 2011-2015 model year Nissan Rogue vehicle equipped with an Xtronic CVT Transmission.**

15.     The CLASS definition specifically excludes all persons have had their AFFECTED VEHICLE repurchased or "bought back" by Defendant NISSAN (whether the buy-back was required by law or was solely pursuant to agreement).  Plaintiff reserves the right to

4

amend the Class and add Sub-Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

## GENERAL ALLEGATIONS

**A. The Defect in NISSAN'S Xtronic CVT Transmission**

16.     The Nissan Rogue was designed by a division of NISSAN called Nissan Design America which is located in California.  NISSAN began selling the AFFECTED VEHICLES in 2011.

17.     The Defect consists of an overheating problem with the Xtronic CVT during normal driving conditions which NISSAN subsequently admitted to in September 2016 with the publishing of a Nissan Technical Services Bulletin to Nissan Dealers which described the effects of the Xtronic CVT overheating and an alleged fix to that Defect.

18.     The Defect causes sudden, dangerous and unexpected deceleration during normal driving conditions despite driver interaction with the gas pedal. This defect is associated with an Xtronic CVT overheating condition, or a failure of the Xtronic CVT to remain cool enough to operate during normal driving conditions.

19.     The defective Xtronic CVT transmission prevents an AFFECTED VEHICLE from accelerating as intended by the driver, despite his or her input.

20.     The Defect is prone to occur during normal driving conditions, creating a serious safety risk for the driver, the AFFECTED VEHICLES' occupants, other drivers, and pedestrians.

21.     Due to the dangerous condition of the AFFECTED VEHICLES and the dangerous consequences of the Defect, this Defect was and is a material fact which NISSAN had a duty to disclose.

**B. NISSAN Omitted and Omits Any Disclosure of the Defect to Prospective Consumers**

22.     Throughout the Class Period, NISSAN disseminated copious and pervasive false and misleading advertising and marketing materials via the television, print and internet to potential consumers throughout the United States extolling the benefits, performance and efficiency of the Xtronic CVT in the AFFECTED VEHICLES.

23.     However, none of this marketing and advertising content contained any disclosure regarding the Defect in every AFFECTED VEHICLE (the "Omission").

24.     These false and misleading advertising and marketing materials containing the Omission consisted of pervasive internet, television, and print media.

25.     Throughout the entire time NISSAN was selling AFFECTED VEHICLES, NISSAN omitted any mention of the Defect in the AFFECTED VEHICLES on all NISSAN websites extolling to virtues and performance of the AFFECTED VEHICLES and the Xtronic CVT, including but not limited to:

- Every official description of the AFFECTED VEHICLES on NissanUSA.com, the official website of NISSAN including,

  - 2011 Nissan Rogue Webpages

  - 2012 Nissan Rogue Webpages

  - 2013 Nissan Rogue Webpages

  - 2014 Nissan Rogue Webpages

  - 2015 Nissan Rogue Webpages

- NISSAN'S description of the Xtronic CVT located at:  https://www.nissanusa.com/blog/ xtronic-cvt-continuously-variable-transmission

6

- NISSAN'S video extolling the benefits and performance of the Xtronic CVT:  https://www.nissanusa.com/content/dam/nissan/vehicles/2016/pathfinder/colors-photos/videos/cvt.mp4

- NISSAN'S advertising and marketing website located at:  http://choosenissan.com

- NISSAN's global website located at:  http://www.nissan-global.com

- Every NissanNews.com Official Press Kit for Every AFFECTED VEHICLE, including but not limited to:

    o  2011 NISSAN ROGUE  Official Press Kit:  http://nissannews.com/en-US/nissan/usa/channels/Rogue-Press-Kits/presskits/2011-nissan-rogue-press-kit-3

    o  2012 Rogue Official Press Kit:  http://nissannews.com/en-US/nissan/usa/presskits/US-2012-nissan-rogue-press-kit

    o  2013 Rogue Official Press Kit: http://nissannews.com/en-US/nissan/usa/presskits/us-2013-nissan-rogue-press-kit

    o  2014 Rogue Official Press Kits: http://nissannews.com/en-US/nissan/usa/presskits/us-2014-nissan-rogue-press-kit, http://nissannews.com/en-US/nissan/usa/presskits/us-2014-nissan-rogue-select-press-kit

    o  2015 Rogue Official Press Kits: http://nissannews.com/en-US/nissan/usa/presskits/us-2015-nissan-rogue-select-press-kit; http://nissannews.com/en-US/nissan/usa/presskits/us-2015-nissan-rogue-press-kit

- Every Official Brochure for every model year of the AFFECTED VEHICLES

7

- On every social media platform used by NISSAN through NISSAN'S accounts at those media platforms, including but not limited to:

  o Nissan Facebook Page:  https://www.facebook.com/nissan/

  o Nissan USA Facebook Page:  https://www.facebook.com/nissanusa/

  o Nissan USA Headquarters Facebook Page:  https://www.facebook.com/pages/
    Nissan-North-America-INC-Headquarters/116847901801372

  o Nissan Reviews Facebook Page:  https://www.facebook.com/NissanReviews/

  o Nissan Design America Facebook Page:  https://www.facebook.com/pages/
    Nissan-Design-America/192699730747661

  o Nissan Motor Acceptance Corporation Facebook Page:  https://
    www.facebook.com/pages/Nissan-Motor-Acceptance-Corporation/
    170268846373513

  o NISSAN'S Twitter Account: https://twitter.com/NissanUSA

  o NISSAN'S Nissan News Twitter Account:  https://twitter.com/nissannews

  o Nissan Global Twitter Account: https://twitter.com/Nissan

  o NISSAN'S Youtube.com channel:  https://www.youtube.com/user/nissanusa
    including such videos uploaded on Youtube servers in California extolling the
    benefits and performance of the Xtronic CVT, https://www.youtube.com/watch?
    v=-SQXPTcr7I0; televisions commercials uploaded to Youtube's servers in
    California promoting the AFFECTED VEHICLES including but not limited to
    https://www.youtube.com/watch?v=-SQXPTcr7I0  (Nissan CVT video 2013);
    https://www.youtube.com/watch?v=nt7Fv1PIONk  (Nissan Rogue 2014 video);

https://www.youtube.com/watch?v=h6H8J_cxtG4 Nissan Rogue 2014 Quick Look

- o Nissan Global Youtube Channel: https://www.youtube.com/channel/ UCIpK0Bh0wFhC-QqgJs6hx5w

- o NISSAN'S "Nissan Owners Channel": https://www.youtube.com/channel/ UCxGaOrr2MAXKNQUKqOWp89A

- o Various other NISSAN social media accounts at social media platforms including Pinterest.com, Instagram.com and Google Plus.

26.     In addition, on every Monroney Window Sticker legally required to be posted on the window on each AFFECTED VEHICLE prior to selling, under the heading "MECHANICAL & PERFORMANCE," NISSAN lists the "Xtronic CVT (Continuous Variable Transmission)."

27.     This statement, that the "Xtronic CVT" is standard "PERFORMANCE" equipment included in the AFFECTED VEHICLES is false and misleading because of the Defect in each Xtronic CVT.

28.     NISSAN knew at the time each Monrony Window Sticker, posted on every AFFECTED VEHICLE, was false and misleading because it omitted any disclosure of the Defect and that Xtronic CVT was not a piece of equipment which would help with the "PERFORMANCE" of the AFFECTED VEHICLES.

29.     Despite knowing the about the extremely dangerous driving conditions caused by the Defect in the Xtronic CVT during normal driving conditions, NISSAN continued to market and sell the AFFECTED VEHICLES with the misleading Monrony Window Stickers containing

the dangerous Defect to unsuspecting consumers without ever disclosing the Defect, while it was under a duty to disclose the Defect.

**C. NISSAN Knowingly Sold Dangerously Defective Vehicles to Consumers.**

30.     Before the first AFFECTED VEHICLE was ever sold and for at least the last ten years, NISSAN was fully aware of an irreparable and dangerous safety Defect present in the Xtronic CVT packaged in all AFFECTED VEHICLES.

31.     NISSAN sold hundreds of thousands of AFFECTED VEHICLES containing the dangerous DEFECT.

32.     NISSAN was aware of the Defect at the time they advertised and sold the AFFECTED VEHICLES.

33.     In fact, NISSAN has received countless consumer complaints regarding the DEFECT, has been the subject of multiple investigations, and has been sued by other consumers complaining of similar defects in the same or virtually identical CVTs in other NISSAN vehicles. See Batista v. Nissan North America, Inc., S.D.Fl., Civ. Ac. No. 1:14-24728; Nelson, et al. v. Nissan North America Inc., D.N.J., Civ. Ac. No. 1:11-05712; Levya, et. al v. Nissan North America Inc., C.D.CA., Civ. Ac. No. 5:17-cv-01870.

34.     The National Highway Safety Administration has also received countless complaints regarding the dangerous Defect in the AFFECTED VEHICLES. NISSAN was aware of and on actual or constructive notice about the above-referenced complaints, investigations, and lawsuits.

35.     In fact, NISSAN has previously issued multiple NISSAN Technical Service Bulletins to its dealers related to the DEFECT in the CVT used in its vehicles.  NISSAN

previously issued an extended warranty program called the "CVT Customer Satisfaction Program" in response to similar issues identified in other NISSAN models.  Shockingly, however, this Program has not been extended to the AFFECTED VEHICLES.

36.     Notwithstanding NISSAN'S long-standing knowledge of this Defect, NISSAN continued to advertise and sell the AFFECTED VEHICLES, failed to issue an appropriate recall, and amazingly, continued to pervasively market the Xtronic CVT as a "PERFORMANCE" feature and that the AFFECTED VEHICLES contained "an intelligent CVT (Continuously Variable Transmission) keeps things smooth and in control."  NISSAN promoted the Xtronic CVT as:  "Xtronic CVT® (Continuously Variable Transmission) is a virtually "gearless" transmission – providing optimal power and efficiency at any speed."

37.     Knowing the Xtronic CVT contained the Defect in Rogue model years 2008-2010, NISSAN extended the powertrain warranty of these model years which also used the Xtronic CVT to 120,000 miles or 10 years whichever came first, and agreed to pay for any repairs which buyers or lessors of those model years had incurred due to attempting to repair the Defect.

38.     However, instead of fixing the Defect in the Xtronic CVT in subsequent model years such as the AFFECTED VEHICLES, NISSAN continued to sell the AFFECTED VEHICLES in subsequent years containing the same Xtronic CVT with the Defect.  Moreover, NISSAN did not extend the warranty on the subsequent AFFECTED VEHICLES and only kept their standard 5 year or 60,000 mile powertrain warranty.

39.     This Defect causes sudden, unexpected deceleration during normal driving conditions despite driver interaction with the gas pedal. This defect is associated with a Xtronic

11

CVT overheating condition, or a failure of the CVT to remain cool enough to operate during normal driving conditions.

40.     The malfunctioning transmission prevents an AFFECTED VEHICLE from accelerating as intended by the driver, despite his or her input on the gas pedal.

41.     It was not until September 2016, when due to the overwhelming consumer complaints regarding the Defect, NISSAN itself in a Technical Service Bulletin NISSAN sent to its dealers, that NISSAN confirmed the overheating Defect and simultaneous unexpected failure of the AFFECTED VEHICLE to accelerate, is prone to occur during normal driving conditions, creating a serious safety risk for the driver, the AFFECTED VEHICLES' occupants, other drivers, and pedestrians.

42.     NISSAN knew of the defects present in its Xtronic CVT prior to the sale of a single AFFECTED VEHICLE, and yet NISSAN never informed the CLASS of the defect present in the Xtronic CVT or of its failed attempts to address the issue in some AFFECTED VEHICLES.

43.     Despite NISSAN's knowledge of the defect present in AFFECTED VEHICLES, NISSAN continued to omit any disclosure of this unresolved safety defect to new and subsequent purchasers and lessees of AFFECTED VEHICLES, and instead chose to conceal it. NISSAN continued to manufacture, market, and distribute new AFFECTED VEHICLES despite NISSAN's failure to remedy the defect.

44.     Despite the release of the September Technical Service Bulletin, NISSAN continues to manufacture and sell AFFECTED VEHICLES equipped with the defective Xtronic CVT without any disclosure to consumers about the dangerous safety Defect.

45.     NISSAN has not developed or distributed a permanent fix for the defect present in all AFFECTED VEHICLES' transmissions.

**D. Plaintiff Arpaia Purchased A 2014 Nissan Rogue With The Undisclosed Safety Defect.**

46.     In or about August, 2015, Plaintiff Arpaia was in the market for a new vehicle. Plaintiff Arpaia was aware of the Nissan Rogue because of NISSAN's pervasive marketing on the television, print and internet.

47.     Plaintiff Arpaia researched the Nissan Rogue on NissanUSA.com and Youtube.com. Plaintiff Arpaia read and relied on the marketing materials posted by NISSAN on NissanUSA.com and Youtube.com, including https://www.youtube.com/watch?v=-SQXPTcr7I0 Nissan CVT video 2013; https://www.youtube.com/watch?v=nt7Fv1PIONk Nissan Rogue 2014 video; and https://www.youtube.com/watch?v=h6H8J_cxtG4 Nissan Rogue 2014 Quick Look. NISSAN'S statements as to the safety and performance of the Nissan Rogue were an important consideration in his decision to buy the Nissan Rogue.

48.     On or about October 15, 2015, Plaintiff Arpaia purchased a brand new 2014 Nissan Rogue from Coral Springs Nissan in Coral Springs, Florida. Like all new AFFECTED VEHICLES, the Monroney Window Sticker was affixed to the window. Plaintiff Arpaia read the Monroney Window Sticker and saw the "Xtronic CVT" listed under "PERFORMANCE."

49.     Like all new NISSAN vehicles, Plaintiff Arpaia's AFFECTED VEHICLE came with NISSAN's basic and drivetrain express written warranties. These warranties were a material factor in Plaintiff Arpaia's decision to purchase the AFFECTED VEHICLE.

50.     Before and at the time of his purchase, NISSAN failed to disclose, concealed,

and materially omitted any facts related to defects, consumer complaints, malfunctions, or

safety hazards related to the AFFECTED VEHICLE's defective transmission.

51.     Before he purchased his AFFECTED VEHICLE, Plaintiff Arpaia read and relied

upon the marketing information provided by NISSAN on the internet, and reviewed NISSAN'S

Youtube videos on the 2014 Nissan Rogue.  Plaintiff Arpaia was never informed of or aware of

transmission overheating Defect with the Nissan Rogue's Xtronic CVT, the possibility the

vehicle would fail to accelerate in response to driver input under normal operating conditions, or

NISSAN's prior failed attempts to address the AFFECTED VEHICLE's defect.

52.     Had NISSAN disclosed the Defect, Plaintiff Arpaia would not have purchased the

AFFECTED VEHICLE or would have paid less for the AFFECTED VEHICLE.  NISSAN

omitted information and facts material to Plaintiff Arpaia purchase and willingness to use the

AFFECTED VEHICLE. To the contrary, he relied upon NISSAN's advertising and marketing

directed at him by NISSAN from California, express and implied warranties that the AFFECTED

VEHICLE was fit and safe for its ordinary purpose, merchantable, and free of defects.

53.     Mr. Arpaia became aware of the Defect while driving back from his job in Naples,

Florida to his home in Boca Raton, Florida.  Traveling approximately 70 miles per hour, the

speed limit along Route 75, Mr. Arpaia noticed a whining sound and that the RPMs on the engine

started to increase, while the speed of the AFFECTED VEHICLE began to suddenly decrease, no

matter what interaction Mr. Arpaia had with the gas pedal.

54.     No engine malfunction lights came on in the AFFECTED VEHICLE warning Mr.

Arpaia that anything was wrong with the AFFECTED VEHICLE.

14

55.   The Defect caused a dangerous condition for Mr. Arpaia, as the sudden deceleration caused the traffic behind him to have to swerve out of the way.

56.   Mr. Arpaia became scared for his safety, slowed the AFFECTED VEHICLE down and pulled over. Because no warning lights had come on, Mr. Arpaia had no idea what was causing the sudden loss of power and the sudden and dangerous deceleration of his AFFECTED VEHICLE.

57.   Mr. Arpaia waited and then re-entered the highway.  However, the dangerous condition manifested itself again, making re-entry dangerous as cars swerved around him.

58.   Mr. Arpaia exited the highway onto Route 441, and stopped at a stop light. However, when the light turned green, and Mr. Arpaia stepped on the gas to accelerate, the AFFECTED VEHICLE did not respond causing a dangerous driving condition as cars swerved around him.

59.    Mr. Arpaia managed to get the AFFECTED VEHICLE back to his house by driving slowly and with the blinkers on.

60.   Mr. Arpaia called the service department of Delray Nissan, a Nissan dealership which was closer to his house as he was afraid to drive the AFFECTED VEHICLE the longer distance to the dealership where he purchased the AFFECTED VEHICLE.

61.   After explaining the problem to the Nissan service technician, the technician explained that he had worked for Nissan for over 20 years, and that NISSAN was aware of the Defect and that the cause of the sudden loss of power was a "defect in the CVT which causes it to overheat." Mr. Arpaia was incredulous and shocked at learning there was an undisclosed, dangerous defect in his AFFECTED VEHICLE.  He stated he never would have purchased the

AFFECTED VEHICLE had he known about the Defect and that the AFFECTED VEHICLE was not worth anything to him because of the Defect rendered the AFFECTED VEHICLE useless under normal driving conditions.

62.     The Service Technician explained that he had received lots of complaints about the same issue and NISSAN was aware of the Defect.

63.     The Service Technician suggested putting new CVT transmission fluid into the AFFECTED VEHICLE.

64.     Mr. Arpaia had this service done and paid for it.

65.     However, this service did not solve the problem with the AFFECTED VEHICLE. The next time Mr. Arpaia drove to work from his home in Boca Raton, FL to Naples, FL, the same dangerous driving conditions manifested themselves and Mr. Arpaia was forced to employ the same driving tactics to get the AFFECTED VEHICLE home.

66.     Mr. Arpaia made another appointment at the same Nissan Dealership with the same service technician.

67.     He also explained the he would try to get a new transmission for the vehicle but that this would not "cure the problem" because the Defect was in all the CVT transmissions for the Rogue.

68.     Mr. Arpaia left the car at the dealership.  Subsequently, the Service Technician called and said that NISSAN would not approve a new transmission but that what was required under a Nissan Technical Service Bulletin was the installation of an "external transmission cooler."

16

69.     Mr. Arpaia questioned whether this external transmission cooler would fix the problem with the transmission or simply create more problems because of the extra parts added to the AFFECTED VEHICLE.  The Nissan Service Technician was unsure and called it a "band aid."

70.     Mr. Arpaia was also concerned that the addition of the external aftermarket transmission cooler kit would lessen the value of his car if he decided to trade it in.

71.     Mr. Arpaia picked up his AFFECTED VEHICLE without having the service done as Nissan would not extend the warranty for any new parts past the original warranty, nor would the dealership affirmatively state that the "fix" would actually solve the problem with the transmission overheating.

72.     Mr. Arpaia refuses to drive his AFFECTED VEHICLE due to the dangerous conditions.

73.     At all times, Plaintiff Arpaia, like all Class and Subclass Members, has driven his AFFECTED VEHICLE in a foreseeable manner and in the manner in which it was intended to be used.

**E. Consumers Have Extensively Reported The Safety Hazard To NISSAN.**

74.     NHTSA provides a system for motor vehicle owners to report complaints relating to safety defects that pose a risk of accidents in vehicles manufactured or imported in the United States, including safety defects relating to transmission malfunctions. The safety defect complaints are entered into the NHTSA consumer complaint automated database, which is accessible to manufacturers and reviewed by NISSAN.

75.     NHTSA also provides these consumer complaints to the vehicle's manufacturer directly, including NISSAN. Given the vast majority of owners of AFFECTED VEHICLES are not aware of NHTSA and/or its reporting system, complaints received by NHTSA form an extremely small minority of the overall number of complaints which have been made to NISSAN directly and/or through their authorized dealerships.

76.     Since at least 2013, NISSAN has received complaints of transmission defects and safety concerns related to the AFFECTED VEHICLES through NHTSA, the Better Business Bureau, NISSAN internet forums, NISSAN dealerships, and directly by owners of AFFECTED VEHICLES.

77.     Despite NISSAN's wealth of knowledge relating to the subject defect in the AFFECTED VEHICLES' transmissions and its clear safety implications, NISSAN has and continues to suppress and conceal this knowledge and has failed to disclose that its AFFECTED VEHICLES' transmissions are defective and dangerous.

78.     Consumers continue to operate AFFECTED VEHICLES and continue to experience dangerous failures of the defective transmission, and are at increased risk for crashes.

79.     These consumer complaints filed with the NHTSA, and delivered to NISSAN, often highlight the safety risk caused by the defect, including reports of near accidents and expressions of concern for drivers' families—without concern and resolution by NISSAN.

80.     NISSAN received and were aware of these consumer complaints. Some of these complaints are reprinted in the paragraphs below.

**F. NISSAN Intentionally Concealed The Safety Defect from Plaintiffs and The Class.**

81.     NISSAN's intent to conceal the transmission defect and its manifest safety implications are evidenced by its inactions and conduct in light of its undisputed knowledge of the safety defect. NISSAN intentionally, deceptively, or with gross negligence concealed the defect and true safety hazard posed because it was aware that disclosure would cause NISSAN significant financial losses, including but not limited to the replacement/recall of AFFECTED VEHICLES.

82.     Plaintiffs and the CLASS would not have purchased or leased their vehicles had they known of the defects or safety hazard. Plaintiffs and CLASS members were denied information that was material to their purchase or lease and material to their willingness to use their AFFECTED VEHICLES. Such information was material to a reasonable consumer in making a decision to purchase, lease, or use such a vehicle.

83.     Moreover, despite the significant complaints and safety concerns about the transmission malfunctions lodged by consumers, NISSAN continues to conceal the defect and safety problems and otherwise prevents reasonable consumers from repairing or discovering this hazard until the defect unexpectedly manifests itself through the frightening, dangerous experience of an AFFECTED VEHICLE'S acceleration failure.

**TOLLING OF THE STATUTES OF LIMITATIONS**

84.     Because the Defect is undetectable until it manifests and NISSAN failed to disclose or intentionally concealed the Defect, Plaintiffs and Class Members were not reasonably able to discover the problem until after purchasing the AFFECTED VEHICLES, despite exercise of due diligence.

19

85.     Plaintiff and the Class had no realistic ability to discern that the Xtronic CVT transmissions in AFFECTED VEHICLES were defective. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and the Class.

86.     NISSAN has known of the Transmission Defect since at least 2010 and has concealed from or failed to alert owners of the AFFECTED VEHICLES of the defective nature of the Xtronic CVT transmissions.

87.     Any applicable statute of limitations has therefore been tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein. Defendant is further estopped from relying on any statute of limitations because of its concealment of the Defect.

## CLASS ALLEGATIONS

88.     This action has been brought and may be properly maintained and certified as a Class Action because:

(a) The questions and issues of law or fact are of a common or general interest, affecting a CLASS of individuals and the public at large;

(b) The CLASS consists of a sufficiently large group of individuals, believed to exceed 10,000 members, and is so large that it is impractical to join all members of the CLASS before the Court as individual plaintiffs. The identity of CLASS members is readily ascertainable from various sources including NISSAN's ownership records, government ownership records, and/or via simple notice by publication;

(c) The questions of law or fact common to the CLASS are

20

substantially similar and predominate over those questions

affecting only specific members of the CLASS;

(d) The CLASS is united by a community of interest in obtaining

appropriate equitable relief including injunctive relief, recall of

AFFECTED VEHICLES, restitution, damages, and other available

relief designed to redress the wrongful conduct of NISSAN;

(e) Plaintiff Arpais is a member of the CLASS and his

claims are typical of the CLASS;

(f) Plaintiff Arpaia will fairly and adequately represent the

claims of the CLASS, and protect the interests of the CLASS

without exercising personal interest or otherwise acting in a

manner inconsistent with the best interests of the CLASS

generally;

(g) Plaintiff Arpaia retained attorneys experienced in the

litigation of class and representative claims and in the area of

consumer protection litigation who have agreed to and will

responsibly and vigorously advocate on behalf of the CLASS as a

whole;

(h) Without class certification, the prosecution of separate consumer

actions by individual members of the CLASS would be

impracticable and financially difficult, and create a risk of

repetitive, inconsistent and varying adjudications. This would have

21

the effect of establishing incompatible standards of conduct for

NISSAN, discouraging the prosecution of meritorious but small

claims, and/or result in adjudications which would be dispositive

of the interests of other CLASS members not parties to the

adjudication, or otherwise substantially impair the ability of

CLASS members to protect their rights and interests;

(i) NISSAN acted or refused to act on grounds generally applicable to

the CLASS, thereby making the award of equitable relief and/or

restitution appropriate to the CLASS as a whole;

(j) The class action procedure is superior to other methods of

adjudication, and specifically designed to result in the fair, uniform

and efficient adjudication of the claims presented by this

complaint. This class action will facilitate judicial economy and

preclude the undue financial, administrative and procedural

burdens which would necessarily result from a multiplicity of

individual actions.

89.     Because the damages suffered by each CLASS member are relatively small

compared to the expense and burden of prosecuting this compelling case against a well-financed,

multibillion dollar corporation, this class action is the only way each CLASS member can

redress the harm that NISSAN caused.

90.     Should individual CLASS members be required to bring separate actions,

Florida's courts would face a multitude of lawsuits that would burden the court system and create

a risk of inconsistent rulings and contradictory judgment. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale, and comprehensive supervision by a single court.

91.     Excluded from the Class are governmental entities, defendant, any entity in which defendant has a controlling interest, and defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

92.     Upon information and belief, plaintiffs allege that the total number of Class members is at least in the hundreds of thousands and that the members of the Class are geographically dispersed across the United States. Consequently, joinder of the individual Class members would be impracticable.

93.     There are many questions of law and fact common to the representative plaintiffs and the proposed Class, and those questions substantially predominate over any individualized questions that may affect individual Class members. Common questions of fact and law include, but are not limited to, the following:

• Whether NISSAN's representations regarding the AFFECTED VEHICLES were false or misleading.

• Whether NISSAN, in violation of applicable law, omitted any disclosure of the DEFECT and charged plaintiff and the members of the AFFECTED VEHICLES which were less than what Plaintiff and the Class paid for them;

• Whether NISSAN engaged in unfair, unlawful and/or deceptive business practices;

• Whether NISSAN failed to disclose material facts about the AFFECTED VEHICLES; and

• Whether plaintiffs and the members of the Class have been damaged by the wrongs complained of herein, and if so, the measure of those damages and the nature and extent of other relief that should be provided.

94.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all Class members have been similarly affected by defendant's common course of conduct.

95.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither plaintiffs nor their counsel have any interests adverse to those of the proposed Class.

96.     Plaintiffs and the members of the Class have suffered, and will continue to suffer, harm as a result of defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, because joinder of all members of the Class would be impractical.

97.     Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation would cause delay and undue expense to all parties affected by defendant's common course of conduct.

98.     The class action device will allow a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum. The conduct of this action as a class action will conserve the resources of the parties and of the judicial system, and will protect the rights of the Class members.

99.     Furthermore, for many, if not most, Class members, a class action is the only feasible mechanism for legal redress for the harm alleged.

100.    Adjudication of individual Class members' claims against the defendant would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication and could substantially impair or impede the ability of other Class members to protect their interests.

**NISSAN HAS SUFFICIENT CALIFORNIA CONTACTS TO APPLY CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200 ET SEQ. and 17500 ET SEQ. EXTRATERROTORIALLY**

101.    The classwide conduct, omission, false and misleading advertising emanated from California and over the internet from California.  These contacts include:

- NISSAN is a California Corporation and does significant business in California.

- NISSAN has at least eleven major facilities in California which are related to the AFFECTED VEHICLES, including but not limited to three research and development facilities, two NISSAN "Sales Offices", two NISSA "Parts Distribution Centers," and two NISSAN "Training Centers," warehouses, in addition to operating through two "Major Ports."  In fact, NISSAN has more facilities in California than any other state.

- NISSAN'S Division, Nissan Design America, which designed the AFFECTED VEHICLES is located in San Diego, California.  This NISSAN division employs engineers and designers among other critical employees.

- NISSAN'S Nissan Technical Center North America, Inc., "e-Powertrain Technical Affairs and Testing Center," a division of NISSAN which is responsible for "Technical support for procurement of parts," "Evaluation of vehicles" and "Technical support & market research" of AFFECTED VEHICLES is located in California.  NISSAN states:  "Nissan Technical Center North America (NTCNA) is responsible for blending technology and engineering to create cars that deliver total customer satisfaction. This process involves interaction and cooperation among all technical departments, which results in 'total vehicle development.'"

- Marketing strategies regarding AFFECTED VEHICLES were developed, designed and disseminated from California. NISSAN has a headquarters in Irvine, California, where a "Chief Marketing Manager" is located who is responsible for "Marketing & Brand Strategy."

- A NISSAN "Director of New Product Marketing" is located in California, along with the following other employees:  A "Customer Experience Manager"; A Senior Manager "Brand Management"; A Senior Manager, "Marketing Communications at [NISSAN]"; A "Customer Experience Analyst at Nissan North America";  An "Aftersales Analyst at Nissan North America Inc."; A "Planner, Sales Operations Systems at Nissan North America"; A "Production Analyst at Nissan"; A "Vehicle Operations Analyst at Nissan

North America"; A Senior "Service Development Manager at Nissan North America"; A

"Customer Experience Manager";

- NISSAN'S social media marketing employees responsible for creating and posting

NISSAN's social media marketing incorporating the misleading marketing materials is

located in California.

- NISSAN creates, hosts, manages and disseminates the misleading and deceptive

marketing on websites and servers located in  California such as through various official

NISSAN Youtube channels on Youtube.com, which is located in California.

  o   For example, NISSAN'S Official Youtube channel states in the "About" section

     with hyperlinks to the NissanUSA.com Official Nissan Website, in addition to the

     other social media platforms located in California on California servers, and

     managed by NISSAN employees from and through California:

     "Description"

     Welcome to the official Nissan YouTube channel. Get ready to immerse yourself

     in all things Nissan, with original video content, in-depth product information and

     much more. This is where Innovation that Excites comes to life.

     Links

     Nissan USA

     Facebook

     Twitter

     Pinterest

Instagram

Google+ "

- NISSAN creates, hosts, manages and disseminates the misleading marketing from California through Facebook.com, on various official NISSAN Facebook accounts, which is located in California.

- NISSAN creates, hosts, manages and disseminates the misleading and deceptive marketing on websites and servers located in California such as through various official NISSAN Youtube channels on Twitter.com, which is located in California.

- NISSAN creates, hosts, managers and disseminates the misleading marketing from California through Pinterest.com, which is located in California.

- NISSAN creates, hosts, manages and disseminates the misleading marketing from California through Instagram.com, which is located in California.

- NISSAN uses the illicit proceeds from selling the AFFECTED VEHICLES to support its significant California operations and pay its California employees.

- NISSAN'S domain name, NissanUSA.com, is registered at MarkMonitor.com a California corporation with its headquarters and operations located in California. NISSAN employees log into the MarkMonitor.com website located in California to operate and maintain the NissanUSA.com domain name and website and create the misleading marketing materials.

- NISSAN uses numerous California companies to supply materials and parts for the AFFECTED VEHICLES.

- A substantial portion of the AFFECTED VEHICLES were sold in California.

28

- In written public media promotions published online regarding NISSAN, NISSAN promotes a California phone number as the "corporate media line" where you can get "more information on the complete line of Nissan vehicles…" such as describe below:

    **"About Nissan North America, Inc.**

    In North America, Nissan's operations include automotive styling, engineering, consumer and corporate financing, sales and marketing, distribution and manufacturing. More information on Nissan in North America and the complete line of Nissan and Infiniti vehicles can be found online at www.nissanusa.com or contact the corporate media line **at 310-771-5631."** (Emphasis added).

### FIRST CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE
### SECTION 17200 ET SEQ. — "UNFAIR" CONDUCT

102.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative. Plaintiffs have standing to pursue this claim as plaintiffs have suffered injury in fact and have lost money or property as a result of NISSAN's actions as set forth above.

103.    Class members have suffered injury in fact and have lost money or property as a result of NISSAN's actions as set forth above.

104.    NISSAN's actions as alleged in this complaint constitute "unfair" conduct within the meaning of California Business and Professions Code Sections 17200 *et seq*.

105.    NISSAN's business practices, as alleged herein, are "unfair" because they offend established public policy and/or are immoral, unethical, oppressive, unscrupulous and/or

29

substantially injurious to its customers. NISSAN's conduct is also "unfair" because NISSAN

failed to disclose that the AFFECTED VEHICLES contained a dangerous safety DEFECT.

106.   As a result of NISSAN's "unfair" conduct, plaintiff and members of the Class

expended money on the AFFECTED VEHICLES that they would not otherwise have spent, and

received lower quality vehicles that was worth less than NISSAN represented and less than

plaintiffs and members of the Class paid for them.

107.   NISSAN's wrongful business practices alleged herein constituted a continuing

course of unfair competition since, throughout the Class Period, NISSAN marketed and sold its

products in a manner that offends public policy and/or in a fashion that is immoral, unethical,

oppressive, unscrupulous and/or substantially injurious to its customers.

108.   Plaintiffs and the Class seek an order requiring NISSAN to make full restitution

of all moneys it has wrongfully obtained from plaintiffs and the Class, along with all other relief

allowable under Business and Professions Code Section 17200 *et seq.*

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE**
**SECTION 17200 ET SEQ. — "FRAUDULENT" CONDUCT**

109.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the

extent necessary, plead this cause of action in the alternative.

110.   Plaintiffs have standing to pursue this claim as plaintiffs have suffered injury in

fact and have lost money or property as a result of NISSAN's actions as set forth above.

111.   Class members have suffered injury in fact and have lost money or property as a

result of NISSAN's actions as set forth above.

112.     NISSAN's actions as alleged in this complaint constitute "fraudulent" conduct

within the meaning of California Business and Professions Code sections 17200 *et seq*.

113.     NISSAN's business practices, as alleged herein, are "fraudulent" because they are

likely to deceive consumers, including plaintiffs and members of the Class. NISSAN failed, and

continues to fail, to disclose all material information to consumers who purchased or leased

AFFECTED VEHICLES concerning the DEFECT, and affirmatively concealed that the

AFFECTED VEHICLES contained a dangerous safety DEFECT.

114.     As a result of NISSAN's "fraudulent" conduct, plaintiffs and members of the

Class expended money on AFFECTED VEHICLES that they would not otherwise have spent,

and received vehicles that were worth less than NISSAN represented and less than plaintiffs and

members of the Class paid for them.

115.     NISSAN's wrongful business practices alleged herein constituted a continuing

course of unfair competition since NISSAN marketed and sold its products in a manner that was

likely to deceive customers.

116.     Plaintiffs and the Class seek an order requiring NISSAN to make full restitution

of all moneys it has wrongfully obtained from plaintiffs and the Class, along with all other relief

allowable under Business and Professions Code Section 17200 *et seq*.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE**
**SECTION 17200 ET SEQ. — "UNLAWFUL" CONDUCT**

117.     Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the

extent necessary, plead this cause of action in the alternative.

118.    Plaintiffs have standing to pursue this claim as plaintiffs have suffered injury in fact and have lost money or property as a result of NISSAN's actions as set forth above.

119.    Class members have suffered injury in fact and have lost money or property as a result of NISSAN's actions as set forth above.

120.    NISSAN's actions as alleged in this complaint constitute an "unlawful" practice within the meaning of Business and Professions Code Section 17200 *et seq.* because NISSAN's actions were "unfair" and "fraudulent," as alleged above, and because they violated Business and Professions Code sections 17500 *et seq.*, which proscribe false advertising, as alleged below.

121.    As a result of NISSAN's "unlawful" conduct, plaintiffs and members of the Class expended money on AFFECTED VEHICLES that they would not otherwise have spent, and received vehicles that were worth less than NISSAN represented and less than plaintiffs and members of the Class paid for them.

122.    Plaintiffs and the Class seek an order requiring NISSAN to make full restitution of all moneys it has wrongfully obtained from plaintiffs and the Class, along with all other relief allowable under Business and Professions Code Section 17200 *et seq.*

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE**
**SECTION 17500 ET SEQ.**

123.    Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative. Plaintiffs bring this claim for relief on behalf of themselves and the Class.NISSAN engaged in advertising and marketing to the public and offered for sale advertising services on a nationwide basis, including in California.

124.    NISSAN engaged in the advertising and marketing alleged herein with the intent to directly or indirectly induce the sale of AFFECTED VEHICLES to customers like plaintiffs.

125.    NISSAN's advertisements and marketing representations regarding the characteristics of the AFFECTED VEHICLES were false, misleading and deceptive as set forth more fully above.

126.    At the time it made and disseminated the statements alleged herein, NISSAN knew or should have known that the statements were untrue or misleading, and acted in violation of Business and Professions Code Section 17500 *et seq.*

127.    Plaintiffs seek restitution and all other relief allowable under Business and Professions Code Section 17500 *et seq.*

## DEMAND FOR JURY TRIAL

128.    The Plaintiffs, the CLASS, and the Florida SUBCLASS hereby demand trial by a struck jury of all issues triable by right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class request that the Court enter an order or judgment against defendant as follows:

1. Certification of the proposed Class pursuant to Fed. R. Civ. P. 23;

2. A declaration that defendant has engaged in the conduct alleged herein;

3. Restitution and disgorgement on certain causes of action;

4. Both pre- and post-judgment interest at the maximum allowable rate on any amounts awarded;

5. Costs of the proceedings herein;

33

6. Reasonable attorneys' fees; and

7. Any and all such other and further relief that this Court may deem just and proper.


Dated: October 1, 2017                    Respectfully submitted,


                                          By: _/s/_____
                                              Kaivon Yasinian

                                          YASINIAN & COOK, LLC
                                          Kaivon Yasinian,
                                          FL Bar No: 107776
                                          3040 Oasis Grand Blvd 2803
                                          Fort Myers, FL 33916
                                          Telephone: (727) 266-7555
                                          kyasinian@yclegal.net


                                          YASINIAN & COOK, LLC
                                          Michael A. Cook, Esq.
                                          FL Bar No: 0107683
                                          3040 Oasis Grand Blvd 2803
                                          Fort Myers, FL 33916
                                          Telephone: (772) 872-1407
                                          mcook@yclegal.net

                                          Attorneys for Plaintiffs and the Class

## VERIFICATION

I, Stephen Arpaia, declare that I have reviewed the foregoing Class Action Complaint ("Complaint") and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason to believe them to be true.  I further declare that I am the owner of AFFECTED VEHICLE during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring

Executed this 3day of October 2017

Stephen Arpaia